**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 7 |
| | : | |
| Stuart Pivar, | : | Case No. 23-10938 (JLG) |
| | : | |
| Alleged Debtor. | : | |

------------------------------------------------------------x

**MEMORANDUM DECISION SUSTAINING THE ALLEGED DEBTOR'S**
**OBJECTION AND DISMISSING THE INVOLUNTARY PETITION**

**APPEARANCES:**

KOUTSOUDAKIS & IAKOVOU LAW GROUP, PLLC
*Attorneys for the Petitioning Creditors*
40 Wall Street, 49th Floor
New York, New York 10005
By:     Ralph E. Preite


*Counsel for Stuart Pivar*
56-60 Court Street, Apartment 4J
Brooklyn, New York 11201
By:     Jorge Pivar-Federici

**HON. JAMES L. GARRITY, JR.**
**U.S. BANKRUPTCY JUDGE**

## Introduction

Philip Mezzatesta ("Philip"), his father Michael Mezzatesta ("Michael"), and Philip's mother Anne Frances Moore ("Anne" and, collectively, the "Petitioning Creditors") filed an involuntary petition (the "Involuntary Petition")[1] for relief under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") against Stuart Pivar ("Pivar" or the "Alleged Debtor"). Pivar is 93 years old, and his assets include an art collection (the "Pivar Collection"). The collection contains a work entitled *Marilyn 35 Times*, which Pivar attributes to the late artist Andy Warhol. The Petitioning Creditors assert breach of contract claims arising out of transactions directly or indirectly related to the Pivar Collection. Just prior to filing the Involuntary Petition, they sued Pivar in New York state court, seeking $5 million in damages based on his alleged breach of "multiple contracts and loan agreements."

Acting pro se, the Alleged Debtor filed an Answer and Amended Answer to the Involuntary Petition in which he objects to the Involuntary Petition essentially on the ground that the Petitioning Creditors' claims are the subjects of bona fide disputes. Now represented by counsel,[2] Pivar has moved to dismiss the Involuntary Petition pursuant to sections 303(b), 305, and 707 of the Bankruptcy Code. The Court conducted an evidentiary hearing in this matter.

---

[1]   *Involuntary Petition Against an Individual*, ECF No. 1  References to "ECF No." are to documents filed on the electronic docket in this Chapter 7 case, No. 23-10938.

[2]   Pivar's counsel has filed a motion for leave to withdraw as counsel. *See Notice of Motion Permitting Withdrawal of Jorge Pivar-Federici as Attorney for Alleged Debtor*, ECF No. 38.

For the reasons stated herein, the Court finds that the Petitioning Creditors' claims are the subject of bona fide disputes as to liability and/or amount. Accordingly, under section 303(b), they are ineligible to file the Involuntary Petition and, on that basis, the Court dismisses the Involuntary Petition.

## Jurisdiction

This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and the Amended Standing Order of Referral of Cases to Bankruptcy Judges of the United States District Court for the Southern District of New York (M-431), dated January 31, 2012 (Preska, C.J.). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O). *See In re Taberna Preferred Funding IV, Ltd.*, 594 B.R. 576, 581 (Bankr. S.D.N.Y. 2018) ("The determination of whether an order for relief should be granted in an involuntary case is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).").

## Background

**The Divorce Action**

Larimore Hampton Pivar ("Larimore") is Pivar's wife. On December 23, 2021, Larimore filed a complaint commencing a divorce action against Pivar in the New York State Supreme Court (New York County). *Larimore Hampton Pivar v. Stuart L. Pivar*, No. 323491/2021 (N.Y. Sup. Ct. filed Dec. 23, 2021) (the "Divorce Action"). That action is pending.

**The State Court Litigation**

Each Petitioning Creditor asserts that he or she is party to one or more agreements with the Alleged Debtor, and that the Alleged Debtor is in breach of each such agreement. On February 24, 2023, the Petitioning Creditors filed a 36-count complaint (the "Complaint") in the New York State Supreme Court, New York County (the "New York Court") against the Alleged Debtor,

Larimore, the American Microcar Company, Inc. ("AMC"), John/Jane Does (1–10), and XYZ

Entities/Corporations (1–10) (the "State Court Action").[3]  The Petitioning Creditors did not

disclose the State Court Action in the Involuntary Petition or in the certifications filed in support

of the Involuntary Petition.

In support of the Complaint,[4] the Petitioning Creditors assert that the defendants "failed to

abide by the terms of multiple contracts and loan agreements."  *Id.* ¶ 1.  In the State Court Action,

the Petitioning Creditors seek to recover damages from the Alleged Debtor totaling $5 million, for

breach of contract (Counts 1–4, 24, 29), Complaint ¶¶ 56–75, 172–76, 197–201; breach of the

implied covenant of good faith and fair dealing (Counts 5–8, 25, 30), *id.* ¶¶ 76–96, 177–81, 202–

06; promissory estoppel (Counts 9–12, 26), *id.* ¶¶ 97–116, 182–86; quantum meruit (Counts 13–

15), *id.* ¶¶ 117–131; breach of implied-in-fact contract (Counts 16–19, 27), *id.* ¶¶ 132–159, 187–

93; unjust enrichment (Counts 20–23, 28, 31), *id.* ¶¶ 160–171, 194–96, 207–09; action on an

account stated (Count 32), *id.* ¶¶ 210–19; and fraud (Counts 33–36), *id.* ¶¶ 220–44.

On April 28, 2023, the Alleged Debtor, acting pro se, timely filed an answer to the

Complaint (the "State Court Answer").[5]  In it, he denies nearly all of the Petitioning Creditors'

---

[3]    See *Mezzatesta v. Pivar*, No. 651011/2023 (N.Y. Sup. Ct. N.Y. Cnty. filed February 24, 2023).  Neither the
Petitioning Creditors nor Pivar submitted the Complaint.  The Court takes judicial of the Complaint because it is a
matter of public record.  *See In re TV Azteca*, No. 23-10385, 2023 WL 8059362, at *3 n.5 (Bankr. S.D.N.Y. Nov. 20,
2023) (taking judicial notice of filings in other litigation); *Sutton ex rel. Rose v Wachovia Sec., LLC*, 208 F. App'x 27,
30 (2d Cir. 2006) (summary order) (holding that filings and orders in other courts "are undisputably matters of public
record"); *Wachovia Corp. v. Citigroup, Inc.*, 634 F. Supp. 2d 445, 448 n.2 (S.D.N.Y. 2009) (considering, on a Rule
12(c) motion, the pleading, documents incorporated by reference in the pleading, and "facts that are subject to judicial
notice); *Reisner v. Stoller*, 51 F. Supp. 2d 430, 454 n.32 (S.D.N.Y. 1999) (taking, on a Rule 12(c) motion, judicial
notice of documents filed in state court).

[4]    *Complaint*, State Court Action, Doc. No. 2.

[5]    *Answer*, State Court Action, Doc. No. 9.  Larimore separately filed a substantively identical answer.  *Answer*,
State Court Action, Doc. No. 8.  No other defendant responded to the Complaint.  The State Court Answer is annexed
as Exhibit 1 to Pivar's Response.

allegations and asserts five affirmative defenses: (i) that the causes of action cited in the Complaint are barred by the statute of frauds, State Court Answer ¶ 245; (ii) that numerous causes of action fail to state a claim upon which relief can be granted in accordance with New York law, *id.* ¶ 246; (iii) that the claims are barred in whole or part, based upon payment, accord and satisfaction, release, waiver, and estoppel, *id.* ¶ 247; (iv) that the claims are barred in whole or part by the petitioning creditors' failure to take reasonable steps to mitigate their damages, *id.* ¶ 248; and (v) all the causes of action fail to state a cause of action against the Alleged Debtor upon which relief can be granted in accordance with New York law, *id.* ¶ 249.  With the State Court Answer, Pivar served discovery demands on the Petitioning Creditors.  Those demands consist of (i) a Notice for Discovery and Inspections; (ii) a 53-paragraph Document Demand; and (iii) a First Set of Interrogatories, consisting of 45 interrogatories.[6]

**The Involuntary Petition**

The Petitioning Creditors did not respond to Pivar's discovery demands in the State Court Action or otherwise take any steps to prosecute that action.  On June 15, 2023, the Petitioning Creditors filed the Involuntary Petition.  In support of the Involuntary Petition, they allege that (i) each Petitioning Creditor is eligible to file the Involuntary Petition under section 303(b) of the Bankruptcy Code, (ii) the Alleged Debtor may be the subject of the Involuntary Petition under section 303(a) of the Bankruptcy Code, and (iii) the Alleged Debtor is generally not paying his debts as they become due, unless they are the subject of a bona fide dispute as to liability or amount. *See* Involuntary Petition, Part 3, ¶ 11.  Each Petitioning Creditor submitted a Certification in support of the Involuntary Petition.  Each asserts that he/she is party to one or more agreements with the Alleged Debtor and that he is in breach of each such agreement. The Petitioning Creditors

---

[6]    The discovery requests are annexed alongside the State Court Answer as Exhibit 1 to Pivar's Response.

contend that each holds an unsecured claim against the Alleged Debtor that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount and that those claims aggregate $765,200 (the "Claims"), as follows:

> Michael—$100,000
>
> Anne—$15,200
>
> Philip—$650,000

*See* Involuntary Petition, Part 3, ¶ 13.

**The Answer and Amended Answer to the Involuntary Petition**

On July 6, 2023, Pivar, acting pro se, filed an answer to the Involuntary Petition (the "Answer").[7]  The Answer did not include a signature page.  On August 30, 2023, Pivar refiled the Answer with a signature page (the "Amended Answer").[8]  In his Amended Answer, Pivar objects to the Involuntary Petition.

In the Amended Answer, the Alleged Debtor objects to and seeks to dismiss the Involuntary Petition on two grounds.  First, he asserts that the Involuntary Petition fails to state a claim for relief under section 303 because the Petitioning Creditors' Claims are subject to bona fide disputes as to liability and amount, and because he has sufficient assets to satisfy all of his debts.  Briefly, to that end, the Alleged Debtor says that his assets "far outweigh" his liabilities, Amended Answer ¶ 6; and that "there currently exists a bona fide dispute not only of the amount in dispute but, in addition, under the facts and circumstances of the case, whether [he has] any liability at all," *id.* ¶ 3. Second, the Alleged Debtor asserts that the Court should dismiss the Involuntary Petition in favor of the State Court Action. He says that the disputes underlying the Claims should be adjudicated

---

[7]    *Answer*, ECF No.  6.

[8]    *Amended Answer*, ECF No. 10.

in the New York Court, *id.* ¶ 24, and notes that the Petitioning Creditors "chose to put their claims in the Supreme Court forum" and that he investigated the Complaint and filed the State Court Answer in a timely manner.  *Id.* ¶¶ 10–11.

**The Reply to the Amended Answer**

On August 7, 2023, the Petitioning Creditors filed a letter with the Court requesting permission to file a reply to the Answer (the "Letter").[9]  They annexed the proposed reply to the Letter.  By order dated August 31, 2023 (the "Amended Scheduling Order"),[10] the Court authorized the Petitioning Creditors to file a reply to the Amended Answer and deemed the proposed reply annexed to the Letter as filed (the "Reply").[11]  In their Reply, without limitation, they contend that objectively, no bona fide dispute exists concerning their Claims.  Reply at 1.

**The Court Authorizes Alleged Debtor to File
Surreply but Alleged Debtor Declines to Do So**

In the Amended Scheduling Order, the Court authorized the Alleged Debtor to file a Surreply to the Reply (the "Surreply") on or before September 19, 2023.  The Alleged Debtor did not file a Surreply.  On September 26, 2023, at an initial hearing on the Involuntary Petition, the Alleged Debtor asked the Court to adjourn the hearing and to grant him additional time in which to file a Surreply.  The Petitioning Creditors consented to the proposed adjournment and to an extension of the deadline to file a Surreply.  The Court granted the Alleged Debtor's request to adjourn the matter and granted him leave to file a Surreply on or before October 13, 2023. The Alleged Debtor did not file a Surreply to the Reply.

---

[9]  *See Request for Permission to file Reply in Opposition to Debtor's Answer*, ECF No. 7.

[10]  *Amended Scheduling Order*, ECF No. 11.

[11]  *Reply of Petitioning Creditors to Answer of Alleged Debtor and in Support of Involuntary Petition*, ECF No. 7-1.

7

**Motion to Appoint Trustee**

On October 19, 2023, the Petitioning Creditors moved to appoint an interim chapter 7 trustee in this proceeding.[12]  First, they contend that Pivar is dissipating his assets, asserting that Pivar has recently made public a formerly private website[13] about his art collection, which they say amounts to advertising his art online for sale.  Trustee Motion ¶¶ 12–13.  They attach as Exhibit A printouts of various items featured on the website, though none of these carry a price or otherwise indicate they are available for sale.  Second, they assert that the Receiver has been appointed in the Divorce Action, with a mandate to seize *Marilyn 35 Times*.  *Id.* ¶¶ 14–17.  Third, they assert that the warehouse containing Pivar's art collection was padlocked by an unidentified third party, and Pivar is unable to access it.  *Id.* ¶¶ 18–21.  Accordingly, "it is crystal clear that [Pivar's] estate is not being preserved and at risk of loss, thus warranting the appointment of an interim trustee."  *Id.* ¶ 21.

Because the estate is purportedly being dissipated in these three ways, the Petitioning Creditors request appointment of an interim chapter 7 trustee pursuant to 11 U.S.C. § 303(g), which provides that a chapter 7 trustee may be appointed during any time after the commencement of an involuntary chapter 7 case but before an order for relief.  *Id.* ¶¶ 23–26.  They therefore request appointment of an interim trustee "to take possession of [Pivar's] property, intercept the alleged receiver, inventory the property, and determine the best manner of storing and preserving the property for the benefit of his estate in the event the involuntary petition is granted."  *Id.* ¶ 29.

---

[12]    *Motion Requesting (A) Appointment of an Interim* [sic] *Pursuant to Bankruptcy Code § 303(g) and Bankruptcy Rule 2001, (B) Authorization to Post Nominal Surety Bond*, ECF No. 17 ("Trustee Motion").

[13]    While the website was publicly available at the time the Trustee Motion was filed, access has since been restricted to the public.

Bankruptcy Rule 2001(b) calls for a creditor who requests the appointment of an interim trustee to furnish a bond "in an amount approved by the court, conditioned to indemnify the debtor for costs, attorney's fees, expenses, and damages allowable under § 303(i) of the Code." Fed. R. Bankr. P. 2001(b). The Petitioning Creditors say that the Court may approve no bond or only a *de minimis* bond. Trustee Motion ¶¶ 32, 40. They base this on their view that (i) Pivar has not incurred any costs; (ii) Pivar's pro se status obviates the need to account for attorney's fees; (iii) Pivar has not incurred filing fees or transportation expenses; and (iv) it is unlikely that any damages will be allowable under section 303(i) because Pivar has not incurred attorney's or costs, "there's no bad faith here," and Pivar "is clearly not paying his debts as they come due." *Id.* ¶¶ 34–40.

**Evidentiary Hearing**

On October 25, 2023, the Court conducted an evidentiary hearing on the Involuntary Petition. At that hearing, Mr. Pivar was represented by counsel. Each of the Petitioning Creditors testified at the hearing and each was cross-examined by Pivar's counsel. The Alleged Debtor did not testify and did not submit any evidence in opposition to the Involuntary Petition. At that time, the Court questioned the parties about the applicability, if at all, of the abstention provisions of section 305 of the Bankruptcy Code and the dismissal provisions in section 707(a) of the Bankruptcy Code. The Court offered the parties the opportunity to brief those issues. Both parties did so.

**The Supplement**

On October 31, 2023, the Petitioning Creditors filed a supplement to the Involuntary Petition (the "Supplement").[14] In it, without limitation, they address their motives in filing the

---

[14]    *Supplement in Further Support of Petition*s ECF No. 27.

Involuntary Petition and matters relating to the application of sections 305 and 707(a) of the Bankruptcy Code to the petition.

They say that they filed the petition for the benefit of all creditors and to prevent the dissipation the Alleged Debtor's assets. Supplement ¶ 1. They argue that there is a risk that Pivar's assets will be unfairly distributed in the Divorce Action. *Id.* Specifically, they assert that in May 2023, in the wake of the commencement of the State Court Action, Larimore revived her dormant Divorce Action and "fast-track[ed]" the divorce so that in less than 60 days, in July 2023, she caused the appointment of a receiver of the Debtor's assets (the "Receiver"). *Id.* ¶ 2. They also assert that in October 2023, perhaps in league with Pivar, she obtained an order of seizure of *Marilyn 35 Times*. *Id.* They assert that many of the factors of a sham divorce exist here which, if true may result in an inequitable distribution of the Debtor's assets to the detriment of the Debtor's creditors. *Id.*

They contend that there are no grounds to dismiss the Involuntary Petition under section 707(a), *id.* ¶¶ 16–25, and that dismissal or abstention under section 305 of the Bankruptcy Code will not serve the interests of the Alleged Debtor's creditors, *id.* ¶¶ 26–39.

**Motion for Relief from Stay**

On November 1, 2023, UBS Bank, USA (the "Bank"), by its servicer, Cenlar FSB (the "Movant"), filed a motion for an order granting relief from the automatic stay (the "Lift Stay Motion").[15] Briefly, the Movant contends that it is a secured creditor of Pivar "pursuant to a note executed by Stuart Pivar on March 9, 2018, whereby Stuart Pivar promised to repay the principal amount of $1,900,000.00 plus interest to UBS Bank, USA" (the "Note"). Lift Stay Motion ¶ 4.

---

[15]    *Motion for Relief from Stay*, ECF No. 28.

To secure repayment of the Note, Pivar and Larimore granted the Bank a security interest in their cooperative unit pursuant to a security interest in the cooperative unit pursuant to a Security Agreement date March 9, 2018.  The security interest was duly recorded by the filing of a UCC Financing Statement in the Office of the City Register of New York City on March 29, 2022, in CFRN 2022000133506 (the "Security Agreement, UCC," Note and Security Agreement, collectively, as the "Loan"), encumbering real property located at 15 West 67th Street, Apt 4FW, New York, NY 10023 (the "Property").  *Id.*  Movant asserts that Pivar has failed to make current mortgage payments due to Movant under the terms of the Loan. As a result, the Mortgage remains due for the December 1, 2021 payment and each subsequent payment thereafter.  *Id.* ¶ 8.

The Movant seeks relief from the automatic stay to continue and/or commence foreclosure proceedings with respect to the Property pursuant to sections 362(d)(1) and (2) of the Bankruptcy Code.  *Id.* ¶ 2.  On the consent of the Movant, the Court has adjourned to hearing on the Lift Stay Motion.

**Response and Cross-Motion to Dismiss Case**

On November 3, 2023, Pivar, through his counsel, filed a response to the Supplement (the "Response")[16] in which he requests the Court to dismiss the Involuntary Petition.  Pivar contends that the Involuntary Petition lacks merit because each of the Petitioning Creditors' claims is subject to a bona fide dispute because (i) it is being litigated in the State Court Action, and (ii) in any event, there are legal and factual grounds on which to dispute the claim.  Response at 2–4.  He also contends that the petition was filed in bad faith and that the Court should dismiss it under sections 707(a) and 305 of the Bankruptcy Code.  Response at 4–9.  Finally, he contends that he is entitled

---

[16]    *Stuart Pivar's Response Seeking Dismissal of Involuntary Petition*, ECF No. 30.

to an award of his attorney's fees and costs under section 303(i) of the Bankruptcy Code. Response at 9–10.

**Efforts to Reach Resolutions Outside of Court**

After the initial hearing on the Involuntary Petition, efforts were made to reach resolutions as to the Petitioning Creditors' asserted claims, the Servicer's lien on the Property, the Receiver's interest in the Divorce Action, and Larimore's own interests. At the Court's urging, the Petitioning Creditors sought to achieve a resolution among the parties in interest. At a status conference on January 30, 2024, the parties advised the Court that settlement efforts failed to produce a resolution.

## Legal Standards

The commencement of a voluntary case under a chapter of title 11 "constitutes an order for relief under such chapter." 11 U.S.C. § 301. In contrast, an involuntary petition filed under section 303 of the Bankruptcy Code is similar to a complaint initiating a lawsuit. The petitioning creditors file the involuntary petition containing their allegations as to the basis for the relief requested under section 303 and must serve a summons on the alleged debtor with a deadline to respond. *See* Fed. R. Bankr. P. 1010(a) (incorporating Fed. R. Bankr. P. 7004).

Pursuant to section 303(a) of the Bankruptcy Code, an involuntary case under chapter 7 of the Bankruptcy Code "may be commenced . . . only against a person . . . that may be a debtor under" chapter 7. 11 U.S.C. § 303(a).

Section 303(b) fixes the numerosity and debt thresholds for petitioning creditors eligible to commence an involuntary case. It is a "'gating' provision, intended to place limitations on the commencement of involuntary cases." *In re Taberna Preferred Funding IV, Ltd.*, 594 B.R. at 594. This section mandates that only creditors holding claims that are "not contingent as to liability or

12

the subject of a bona fide dispute as to liability or amount" are qualified to be petitioning creditors. Where a debtor has twelve or more creditors, an involuntary case may be commenced only by three or more qualified creditors.   11 U.S.C. § 303(b)(1).   If the debtor has fewer than twelve creditors, a single qualified creditor that meets the qualification requirements under that section may commence an involuntary case.  S*ee* 11 U.S.C. § 303(b)(2); *see also In re Aminian*, No. 07-12957, 2008 WL 793574, at *1 (Bankr. S.D.N.Y. Mar. 25, 2008) ("Under 11 U.S.C. § 303(b)(1), an involuntary case may be commenced by three or more qualified creditors that meet the qualification requirements under that section.  If the debtor has fewer than twelve creditors, a single qualified creditor may commence an involuntary case, *see* 11 U.S.C. § 303(b)(2)." ).

In considering the application of section 303(b), if the alleged debtor contests the petitioning creditors' claims, the creditors bear the burden of establishing that their claims are not subject to a bona fide dispute as to ether liability or amount.  *See In re Manolo Blahnik USA, Ltd.*, 619 B.R. 81, 90–91 (Bankr. S.D.N.Y. 2020) ("A creditor must satisfy both prongs of this test; the claim must not be subject to a bona fide dispute as to *either* liability *or* a dispute as to amount." (quoting *In re Aminian*, 2008 WL 793574, at *2)); *see also Key Mech. Inc. v. BDC 56 LLC (In re BDC 56 LLC)*, 330 F.3d 111, 118–19 (2d Cir. 2003) ("Any creditor wishing to invoke the bankruptcy court's jurisdiction in an involuntary case should be required to demonstrate at the earliest practicable point that its petition satisfies this requirement."), *abrogated on other grounds*, *In re Zarnel*, 619 F.3d 156 (2d Cir. 2010).

Courts employ an objective test in assessing whether a petitioning creditor's claim is the subject of a bona fide dispute.  *In re TV Azteca, S.A.B. de C.V.*, 2023 WL 8059362, at *6.   In applying that test, the courts analyze "whether there is an objective basis for either a factual or a legal dispute as to the validity of [the] debt." *Id.* (quoting *In re BDC 56 LLC*, 330 F.3d at 117).  A

13

bona fide dispute exists if "there is either a genuine issue of material fact that bears upon the debtor's liability or a meritorious contention as to the application of law to undisputed facts." *In re Manolo Blahnik USA, Ltd.*, 619 B.R. at 91 (quoting *Crest One Spa v. TPG Troy, LLC (In re TPG Troy, LLC)*, 793 F.3d 228, 234 (2d Cir. 2015)). "[T]he legislative history makes it clear that Congress intended to disqualify a creditor whenever there is any legitimate basis for the debtor not paying the debt, whether that basis is factual or legal." *In re BDC 56 LLC*, 330 F.3d at 117 (quoting *In re Lough*, 57 B.R. 993, 997 (Bankr. E.D. Mich. 1986)).

While "the mere existence of pending litigation . . . or the filing of an answer is insufficient to establish the existence of a bona fide dispute," courts maintain that "'pending litigation over a claim strongly suggests' the existence of a bona fide dispute, even if it does not suffice to firmly establish that existence." *In re TPG Troy*, 793 F.3d at 234 (quoting *In re TPG Troy, LLC*, 492 B.R. 150, 159–60 (Bankr. S.D.N.Y. 2013)); *see also Credit Union Liquidity Servs., L.L.C. v. Green Hills Dev. Co., L.L.C. (In re Green Hills Dev. Co., L.L.C.)*, 741 F.3d 651, 659 (5th Cir. 2014) ("Bankruptcy courts routinely consider the existence and character of pending but unresolved litigation as evidence of a bona fide dispute."); *Adell v. John Richards Homes Bldg. Co., L.L.C. (In re John Richards Homes Bldg. Co., L.L.C.)*, 312 B.R. 849, 853 (E.D. Mich. 2004) ("These [state-court] filings by [the putative debtor] are important because they indicate that [the petitioning creditor's] claims . . . were in dispute."), *aff'd*, 498 F.3d 248 (6th Cir. 2006). Facts that "create an affirmative defense" (e.g., impossibility of performance, recoupment, etc.) may suggest that "the claim is subject to a bona fide dispute." *In re Honolulu Affordable Housing Partners, LLC*, No. 15-00146, 2015 WL 2203473, at *5 (Bankr. D. Haw. May 7, 2015).

Courts in this circuit employ a burden-shifting framework, "which requires, first, that the petitioning creditor establish a prima facie case that no bona fide dispute exists. Once a prima

14

facie case has been established, the burden shifts to the debtor to demonstrate the existence of a

bona fide dispute." *In re BDC 56 LLC*, 330 F.3d at 118. "Because the standard is objective,

neither the debtor's subjective intent nor his subjective belief is sufficient to meet this burden,"

and "[t]he court's objective is to ascertain whether a dispute that is bona fide exists; the court is

not to actually resolve the dispute." *Id.* (quoting *Rimell v. Mark Twain Bank (In re Rimell)*, 946

F.2d 1363, 1365 (8th Cir. 1991)). "Petitioning creditors bear the ultimate burden of proving that

all statutory requirements of Bankruptcy Code Section 303 have been met." *In re Palace Oriental

Rugs, Inc.*, 193 B.R. 126, 128 (Bankr. D. Conn. 1996).

　　Where the petitioning creditor and alleged debtor have engaged in multiple transactions,

"the petitioning creditor may be permitted to rely on an undisputed claim where it arises from a

separate transaction between the same parties." *In re Manolo Blahnik USA, Ltd.*, 619 B.R. at 92

(citing *Fustolo v. 50 Thomas Patton Drive, LLC*, 816 F.3d 1, 11 (1st Cir. 2016)); *see also In re

Euro-Am. Lodging Corp.*, 357 B.R. 700, 720–21 (Bankr. S.D.N.Y. 2007) (finding that the

undisputed nature of a claim for occupancy taxes was not affected by portion of that claim which

was subject to a bona fide dispute, since the disputed portion "arose out of a different tax-related

transaction").

　　The state of the law is not settled where there is a single transaction among the petitioning

creditor and alleged debtor. Prior to the 2005 amendments to the Bankruptcy Code, a dispute under

section 303(b)(1) limited to the amount of a petitioning creditor's claim "was not a 'bona fide'

dispute as to the entire claim." *In re Euro-Am. Lodging Corp.*, 357 B.R. at 712 n.8. Accordingly,

a bona fide dispute existed "where a claim for offset ar[ose] out of the same transaction and [was]

directly related to the creditor's underlying claim, and, if valid, could serve as a complete defense

to that claim." *In re BDC 56 LLC*, 330 F.3d at 120. In the 2005 amendments, the phrase "as to

15

liability or amount" was added to section 303(b)(1) following the phrase "subject to a bona fide dispute." *In re Euro-Am. Lodging Corp.*, 357 B.R. at 712 n.8 (citing Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 1234(a)(1)(A) and (a)(2), 119 Stat. 23 (2005)).  Judge Bernstein found that  "[a]s a result of the amendment, any dispute regarding the amount that arises from the same transaction and is directly related to the underlying claim should render the claim subject to a *bona fide* dispute." *Id.*

Since the enactment of the amendments, courts have been split as to whether "a dispute as to any portion of a claim, even if some dollar amount would be left undisputed, means there is a bona fide dispute as to the amount of the claim."  *In re Koffee Kup Bakery, Inc.*,  No. 21-10168, 2022 WL 141516, at *7 (Bankr. D. Vt. Jan. 14, 2022) (quoting *State Dep't of Revenue v. Blixseth*, 942 F.3d 1185 (9th Cir. 2019)).  Some bankruptcy courts have read the 2005 amendment to mean that a bona fide dispute as to amount is not relevant unless it will deny a creditor of standing by reducing the claim below the statutory minimum.  *See In re Gen. Aeronautics Corp.*, 594 B.R. 442, 464 (Bankr. D. Utah 2018); *In re DemirCo Holdings Inc.*, Case No. 06-70122, 2006 WL 1663237, at *3 (Bankr. C.D. Ill. June 9, 2006); *In re ELRS Loss Mitigation, LLC*, 325 B.R. 604, 626–27 (Bankr. N.D. Okla. 2005).

However, the three circuit courts that have considered the matter have determined that "a creditor whose claim is the subject of a bona fide dispute as to liability or amount lacks standing to be a petitioning creditor under § 303(b)(1), even if a portion of their claim amount is undisputed and that undisputed amount is sufficient to meet the claims amount threshold."  *In re Koffee Kup Bakery, Inc.*, 2022 WL 141516, at *7 (citing *Blixseth*, 942 F.3d at 1185; *Fustolo*, 816 F.3d at 9; *Credit Union Liquidity Servs., L.L.C. v. Green Hills Dev. Co., L.L.C. (In re Green Hills Dev. Co., L.L.C.)*, 741 F.3d 651, 660 (5th Cir. 2014)). The Second Circuit has not ruled on this issue.

16

However, the bankruptcy courts within this Circuit that have addressed the issue are nearly uniform in reaching the same conclusion as the First, Fifth, and Ninth Circuits. *See In re TV Azteca, S.A.B. de C.V.*, 2023 WL 8059362, at \*7; *In re Koffee Kup Bakery, Inc.*, 2022 WL at \*6–7; *In re Euro-Am. Lodging Corp.*, 357 B.R. at 712 n.8; *In re Mountain Dairies, Inc.*, 372 B.R. 623, 633–34 (Bankr. S.D.N.Y. 2007). *But see In re EM Equip., LLC*, 504 B.R. 8, 16 (Bankr. D. Conn. 2013). The Court joins with the majority view of the bankruptcy courts in this Circuit.

Finally, under section 303(h), if the involuntary petition is not timely challenged, "the court shall order relief against the debtor . . . under the chapter under which the petition was filed." 11 U.S.C. § 303(h). In contrast, if the involuntary petition is timely controverted, as relevant, the court shall order relief only if "the debtor is generally not paying such debtor's debts as such debts become due unless such debts are the subject of a bona fide dispute as to liability or amount." *Id.* § 303(h)(1). "The petitioning creditors have the burden of proving all statutory requirements of Bankruptcy Code § 303, including that the debtor is *generally* not paying its bills on time." *In re A&J Quality Diamonds, Inc.*, 377 B.R. 460, 463 (Bankr. S.D.N.Y. 2007) (citing *In re Palace Oriental Rugs, Inc.*, 193 B.R. at 128).

<u>**Analysis**</u>

Below, the Court considers whether the Petitioning Creditors have met their burden of demonstrating that their claims are not the subject of bona fide disputes and, as such, they are eligible to file the Involuntary Petitions.

<u>Ongoing Litigation</u>

As an initial matter, the Petitioning Creditors argue that the mere pendency of the State Court Action does not in itself make their Claims subject to bona fide disputes. As support, they rely on *In re Ross*, 63 B.R. 951 (Bankr. S.D.N.Y. 1986). In *Ross*, the alleged debtor moved to

dismiss an involuntary chapter 7 petition filed against him on the grounds of insufficient eligible petitioning creditors. *Id.* at 957. In determining that, objectively, there did not exist a bona fide dispute in that case, the bankruptcy court concluded that the debtor "cannot create a bona fide dispute with respect to each of the petitioner's claims through mere litigiousness" and noted that the debtor had initiated an immense amount of non-bankruptcy litigation against the petitioning creditors. *Id.* at 954. The bankruptcy court determined that, given the substantial litigation which the debtor had commenced against the petitioning creditors and the deluge of proceedings resulting from such litigation, "[t]he facts of [the] case have caused this court to conclude that it must reject any idea that the mere pendency of a lawsuit relative to a petitioner's claim creates a bona fide dispute." *Id.* at 960. The bankruptcy court noted that the debtor's "capacity for litigation makes it apparent that adoption of such a *per se* rule would allow any debtor to avoid or defeat an involuntary petition simply through engaging in litigation." *Id.* The bankruptcy court then reviewed the litigation status of each of the petitioning creditors' claims. For example, it discussed a claim in which two creditors had earned a judgment of liability against the debtor and thus in their favor. The debtor asserted that he disagreed with the judgment of liability, but the bankruptcy court held found that the debtor's subsequent disagreement with that judgment and the trial court's rulings did not create a bona fide dispute as to the creditors' claims. *See id.* at 965–67. Critically, the bankruptcy court found as follows:

> The pre-involuntary entry of a judgment of liability, while not creating a final judgment, is a giant step towards entry of a final judgment and a clear signpost of the debtor's exposure to the Claimant which this court is not free to ignore. Moreover, here the matter, including the damages issue, had been completely litigated before the involuntary petition intervened and the timing of [the creditors'] joinder as petitioners precludes any suggestion that the joinder was a mere litigation tactic.

*Id.* at 967.

The facts of this case are readily distinguishable from those in *Ross*. In that case, several of the petitioning creditors' claims in the underlying litigations had been litigated to judgments; therefore, the involuntary debtor's liability was undisputed, and the bankruptcy court found that there existed no bona fide dispute with respect to those claims. In this case, however, the State Court Action is in its nascent stages. The New York Court has not entered any orders and that the Alleged Debtor served interrogatories and requests for documents upon the Petitioning Creditors in that case along with his answer. The only pleadings of significance that have been filed are the Complaint and the State Court Answer. The Petitioning Creditors' claims have not been fully litigated to judgments in the State Court Action, unlike those of the creditors in *Ross*. Further, the Court stresses that, in reaching its conclusions, the ongoing state-court litigation is only one of many factors on which it relies.

The Court also attaches no weight to the Petitioning Creditors' contention that the Alleged Debtor is purportedly "predisposed" to litigation. Their attempt to analogize his participation to numerous lawsuits to those of the debtor in *Ross* fails. In *Ross*, it was the involuntary debtor who ignited a deluge of lawsuits against the petitioning creditors in effort to deny liability. *See In re Ross*, 63 B.R. at 954. However, review of the list of lawsuits annexed to the Reply demonstrates that the Alleged Debtor's situation is not analogous to that in *Ross*. To begin, of the twelve lawsuits which appear in the list, the Alleged Debtor is a plaintiff in only seven. *See* Litigation List at 1– 2. In the Litigation List, the Petitioning Creditors provide a brief description of each of the lawsuits. The seven lawsuits in which the Alleged Debtor is a plaintiff concern issues that are unrelated to the Petitioning Creditors' Claims. The lawsuits revolve around (i) a claim against the Alleged Debtor's former attorney; (ii) a suit for defamation; (iii) a lawsuit against the Alleged Debtor's former family counsel, alleging fraud and breach of contract; (iv) a suit commenced

19

alleging breach of consignment agreement; (v) a suit alleging breach of contract and failure to exercise due care; (vi) an appeal from a state court case to disqualify counsel which was denied; and (vii) an appeal from a state court action against Pivar's former attorney. *Id.* at 1. Unlike the alleged debtor in *Ross*, the Alleged Debtor's other lawsuits do not evidence an attempt to create a bona fide dispute. Notably, none of the Petitioning Creditors are listed named in any of the other lawsuits as provided in the Litigation List.

Moreover, and perhaps most significantly, it was the Petitioning Creditors who initiated the State Court Action in the New York Court, not the Alleged Debtor. Therefore, the Court attaches no weight to the Petitioning Creditors' assertion that the Alleged Debtor is purportedly attempting to manufacture a bona fide dispute. The evidence in the record clearly does not demonstrate that the Alleged Debtor possesses a predisposition to litigiousness relevant to the facts of this case.

Michael

Michael says that on or about March 21, 2021, "citing cash flow issues and a time-sensitive opportunity," the Alleged Debtor asked him for a $75,000 loan to be paid back within thirty days, and he agreed to make the loan on those terms. Michael Certification ¶ 7. Michael says that he agreed to make that loan. He explains that, to fund it, he withdrew cash from his retirement account and that, in doing so, he incurred federal and state withholding tax penalties aggregating approximately $13,000, which would be refunded to him if the funds were replaced within sixty days of withdrawal. *Id.* ¶ 7. Michael maintains that on March 21, 2019, he wired a $75,000 loan

to Pivar and paid $13,000 in withheld federal and North Carolina state taxes.[17]  Michael says that

Pivar is liable to him for the $75,000 he wired to Pivar, plus the $13,000 tax penalty, plus interest

through the payment date.

The Involuntary Petition lists Michael as holding an unsecured claim against the Alleged

Debtor in the sum of $100,000 on account of a "[b]reach of contract."  Involuntary Petition, Part

3, Item 13.[18]  In the Supplement, Michael identifies the contract as an $88,000 Demand Promissory

Note dated April 1, 2021 (the "Demand Note").  *See* Supplement, Ex. B.  The note shows a

principal amount due of $88,000 with interest accruing at a rate of six percent (6%) per annum

from April 1, 2021, to the date of payment.  Michael relies on the Demand Note and a number of

emails, some of which are with Pivar, as evidence of Pivar's obligation to him.[19]  In his March 19,

---

[17]    Annexed to Michael's Certification is a confirmation of the wire transfer from Michael to Pivar in the amount of $75,000 and confirmation of the withholding of federal and North Carolina state withholding taxes for Michael's account in the amounts of $8,823.53 and $4,411.76, respectively.  *See* Michael Certification, Ex. C.

[18]    Michael asserts that in early March 2021, the Alleged Debtor approached him about consulting for a museum project to house the Alleged Debtor's art collection on land that the Alleged Debtor "owns or planned to purchase in Western Massachusetts."  Michael Certification ¶ 5.  He contends that the Alleged Debtor offered him an annual salary of $1.5 million to establish, create, and run the museum, and that he accepted the offer.  *Id.* ¶ 6.  As evidence of the alleged offer and his acceptance thereof, Michael submitted an email that he sent to his son, Philip.  The email is annexed to the Michael Certification as Exhibit A.  The email from Michael to Philip, dated March 8, 2021, states as follows:

> Stuart offered me $1,500,000 per annum for my services, that's $125,000 a month !!!
> Shall I reconfirm this with Stuart or just send him my Schwab wire transfer information with a thank you?
> I have contacted Olga Zoria for an initial discussion about finding a large space for Stuart's project, which I
> call: PARC
> PIVAR ART RESOURCE CENTER
> More to come…..

Michael did not submit emails to or from Pivar or any other writing from Pivar as evidence of this alleged employment offer.  Although Michael is asserting that claim in the State Court Action, he is not asserting a claim for unpaid wages in support of the Involuntary Petition.

[19]    The emails are annexed as Exhibit B to the Michael Certification.  The emails include the following:

> An email from Michael to Clark Troy, his financial advisor, dated March 18, 2021, stating that he
> was "going to provide St[u]art Pivar a short term bridge loan of $75,000."

> An email from Mr. Troy to Michael, dated March 19, 2021, stating that the cash had been settled in
> Michael's account and could be wired directly from his IRA to the Alleged Debtor's account.  The
> email states that Michael would have taxes withheld from the transfer, the gross amount of which

2021 email to Pivar, Michael confirms that the "75K is being processed today" and, according to

his financial advisor, the "75K" should be in Pivar's account on Monday, March 21, 2021.  In

Pivar's March 22, 2021 email to Michael, he confirms his receipt of the funds.

The correspondence between Pivar and Michael that Michael relies on in support of the

claim speaks to a $75,000 loan from Michael to Pivar.  It does not address Pivar's liability for the

$13,000 tax penalty.  The record is clear that Michael wired Pivar $75,000 as a loan to Pivar on

March 21, 2021, that on March 22, 2021, Pivar acknowledged receipt of the proceeds, and that

Pivar has not paid Michael anything on account of the loan.  The record made by Michael in

support of the claim contains no evidence to support his contention that Pivar is liable for the

$13,000 tax penalty.  Indeed, in his Certification, Michael speaks only of Pivar's liability under

the "$75,000 Loan Agreement."  He does not mention the tax penalty.  Michael Certification ¶ 9.

There is no clear documentation that supports Michael's $88,000 claim against Pivar.  He has failed

---

would be $88,500, and that "if we get the $75k back from the Pivars in time to replace it in your
account within 60 **calendar days** (not business days), it can be treated as a tax-free rollover, and the
taxes withheld will be refunded to you when you file your taxes for 2021."  (alteration in original).
The email also states that Michael would receive an email from Schwab on Monday, March 21,
2021, with a Docusign envelope which Michael would need to e-sign to release the transaction.

An email from Michael, dated March 19, 2021, to Mr. Troy, stating that Michael "understand[s] the
process for the wire transfer on Monday."

An email from Michael to the Alleged Debtor, dated March 19, 2021, in which Michael states that
the "75K is being processed today," that according to his financial adviser the $75K "should be in
[his] account by Monday, and that he was "glad that [he] was able to assist [the Alleged Debtor]
with this loan . . ."

An email from the Alleged Debtor to Michael, dated March 22, 2021, confirming that he "[g]ot it
and none too soon."

An email from Michael to the Alleged Debtor, dated March 22, 2021, stating that he was "[g]lad to
help advance the cause."

Annexed as Exhibit C to the Michael Certification is a document from Schwab confirming the transfer of the
$75,000 Loan as well as the withholding of the taxes.

to demonstrate that Pivar is liable as to a "particular amount," and, accordingly, has failed to establish a prima facie case that the claim is not subject to a bona fide dispute. *See In re Mountain Dairies, Inc.*, 372 B.R. at 631–33 (finding that where the petitioning creditor did not provide clear documentation of a sum certain that would be due from the alleged debtor, it failed to establish that the alleged debtor was "liable as to a particular amount" and therefore failed to establish a prima facie case that no bona fide dispute exists.); *see also In re Taub*, 439 B.R. 261, 275 (Bankr. E.D.N.Y. 2010) (concluding that petitioning creditors failed to carry their initial burden where they did not "come forward with any calculations justifying the amount of the claim.").

Moreover, and in any event, Pivar denies that he is liable to Michael under the Demand Note. In his Response, he denies that he signed the note and denies that the signature affixed to the note is his signature. Response at 3.[20] In addition, in the State Court Action, he denies essentially all of the allegations made in support of Michael's claims. State Court Answer ¶¶ 41–43, 45–46, 48–49. In particular, Pivar denied offering Michael a $1.5 million salary to establish the museum that Michael accepted; he denied requesting a 30-day loan for $75,000 and that he was aware of the importance of the 30-day timeline; he denied having failed to repay Michael; and he denied that the amount owing was $88,000 plus interest. *Id.* ¶¶ 42–43, 45, 48–49.

The Court finds that Michael has not met his burden of demonstrating that his claim is not the subject of a bona fide dispute as to liability and amount. *See In re Manolo Blahnik*, 619 B.R. at 90–91. Because Michael relies solely on his claim under the Demand Note in support of the

---

[20]    In the Response, Pivar includes a number of documents executed and filed in this case and in the State Court Action. The signatures on those documents are substantially identical. All of them are materially different than the signature on the Demand Note. In each signature, Pivar's first name is spelled out, and both the first name and surname are written in cursive—the "S" in "Stuart" forms a prominent loop to connect with the following "t." On the note, among other differences, only the initial "S" is written for the first name, and the entire signature is not cursive, i.e., each letter is printed individually.

Involuntary Petition, he is ineligible to serve as a petitioning creditor under section 303(b)(1) because his claim is subject to a bona fide dispute as to liability and amount.  *See In re TPG Troy, LLC*, 793 F.3d at 234; *In re Euro-Am. Lodging Corp.*, 357 B.R. at 712 n.8; *In re Mountain Dairies, Inc.*, 372 B.R. at 631–33.

Anne

The Involuntary Petition lists Anne as holding an unsecured claim against Pivar in the sum of $15,200.00 on account of a "[b]reach of contract."  Involuntary Petition, Part 3, Item 13.  Anne states that in or around August 2021, Pivar hired her to conduct a fair market valuation of a work attributed by Pivar to the artist Andy Warhol, entitled *Marilyn 35 Times*, and to prepare condition reports for two works by Willem de Kooning (the "Reports").  Anne Certification ¶ 5.  Anne's agreement with Pivar is not reduced to writing.  In support of her claim, she submitted an unpaid invoice dated January 17, 2023, in the sum of $15,150.54 (the "January Invoice").[21]  The invoice is clear documentation that there is a sum certain due to Anne from Pivar.  Anne has made a prima facie showing that that there is no bona fide dispute as to the amount or liability of her claim against Pivar. *See In re Manolo Blahnik USA, Ltd.*, 619 B.R. at 93–94 (stating that the petitioning creditor "established a prima facie case with respect to the Alleged Debtor's liability" for a transaction by "attach[ing] the unpaid invoices . . . evidencing the Alleged Debtor's liability and nonpayment"); *see also In re Vicor Techs., Inc.*, No. 12-39329, 2013 WL 1397460, at *7 (Bankr. S.D. Fla. 2013) (concluding that the petitioning creditors met their "initial burden through their separate declarations, the documents attached thereto, and Exhibit A to the Motion for Summary

---

[21]    Anne also submitted an invoice dated August 18, 2021, in the sum of $11,150.00.  The January Invoice amended and superseded that invoice.

Judgment," which consisted of an accounts payable ledger showing the alleged debtor's unpaid claims).

Pivar does not dispute that he retained Anne to conduct a fair market valuation of *Marilyn 35 Times*, and to prepare condition reports for two works by Willem de Kooning. Indeed, he acknowledges that Anne "expertly opined that a single work in my art collection, entitled *Marilyn 35 Times*, by Andy Warhol, has a fair market value of $100,000,000." Amended Answer ¶ 7. Still, he says that he "ha[s] a dispute with the petitioners. They represented themselves to me as professionals and experts in their fields. I mistakenly relied [sic] and trusted their claimed expertise in the end to my detriment." *Id.* ¶ 17.

Pivar complains that Anne "never actually physically examined *Marilyn Thirty-five Times*, which makes her appraisal, while accurate in terms of value, of little value to a true connoisseur or purchaser." *Id.* ¶ 20. Anne says that Pivar prevented her from physically examining the painting and that her methodology in analysis of the painting conformed to industry standards. During the hearing, Anne addressed that alleged shortcoming in her report. In substance, she explained that she conducted her analysis of *Marilyn Thirty-five Times* during the COVID-19 pandemic. The painting was in Pivar's possession and Anne was advised by a member of Pivar's staff that she could not access the painting because Pivar was not receiving visitors. Anne determined that moving the painting out of Pivar's home to a neutral location would have been impractical due to the painting's large size and fragile condition. As a substitute, Anne conducted her evaluation of the painting using high-resolution photographs, which was an accepted practice within her industry.

Through counsel, Pivar "denies that he restricted access to the artwork." Response at 4. He does not dispute his liability to Anne for the work she has done, and "accepts the value [Anne]

25

attributes to the artwork." *Id.* However, he "disputes the cost she charged for doing the work." *Id.* In addition, in the State Court Action, Pivar denies essentially all of the allegations in support of Anne's state-court claims. State Court Answer ¶¶ 50–55, 197–210; 212–19. In particular, Pivar denies that Anne conducted the fair market valuation and prepared the condition reports as requested, that she presented the Pivar Defendants with invoices, that the invoices were not paid, and that the amount due and owing is $15,150.54 with interest. *Id.* ¶¶ 50–55.

The Court will not resolve the dispute. *In re TPG Troy*, 793 F.3d 228, 234 (2d Cir. 2015) ("Critically, while a court is called upon to determine the presence of a bona fide dispute, it is not called on to resolve such dispute.") The Court finds that Pivar and Anne's competing contentions regarding the adequacy of the Report create a material factual dispute as to the extent of Pivar's liability to Anne. See *In re Manolo Blahnik*, 619 B.R. at 96 (finding that competing narratives of alleged debtor and creditor regarding claim "create[d] a material factual dispute" with respect to the claim).

In support of the Involuntary Petition, Anne relies solely on her claim for services performed in compiling the Reports. She is ineligible to serve as a petitioning creditor under section 303(b)(1) because her claim is subject to a bona fide dispute as to amount. *See, e.g.*, *In re Euro-Am. Lodging Corp.*, 357 B.R. at 712 n.8; *In re Mountain Dairies, Inc.*, 372 B.R. at 631–33.

<u>Philip</u>

The Involuntary Petition lists Philip as holding an unsecured claim against the Alleged Debtor in the sum of $650,000 on account of "[b]reach of contract." Involuntary Petition, Part 3, Item 13. Philip bases his claim on amounts allegedly due and owing by Pivar to him under three agreements—the 2019 Agreement, the 2021 Agreement, and the AMC Agreement—and on

account of a $50,000 loan to Pivar (the "$50,000 Loan").  The Alleged Debtor contests those

claims.  The Court considers them below.

### The 2019 Agreement and 2021 Agreement

Philip asserts that on or about September 12, 2019, Pivar hired him to act as the curator of

the Pivar Collection.  Philip Certification ¶ 5.  The agreement is memorialized in an email from

Pivar to Philip dated September 12, 2019.[22]  The email reads as follows:

> This is to confirm our understanding that you agree to work for the Collection for
> one year to improve its reputation and to work on the policy of selling certain of
> the works for sums in the area of fifty million dollars, and the of sales made of
> works from the collect during the period you will receive twenty percent of the
> difference between the cost and selling price. During the period you will receive
> $6,000 per month. At the end of the period the Collection will owe you a guaranteed
> minimum of $250,000.

*Id.* Ex. A (the "2019 Agreement").  Philip contends that, in January 2021, the Alleged Debtor

offered to renew the 2019 Agreement via the 2021 Agreement, and that he accepted the offer (the

"2021 Agreement").  The agreement is not reduced to writing.  Pivar asserts that the terms of the

2021 Agreement are the same as the 2019 Agreement, except that the Alleged Debtor agreed to

reimburse him for the rental of short-term housing.  Philip Certification ¶ 12.  He also says that the

Alleged Debtor promised to pay him the outstanding balance owed under the 2019 Agreement as

inducement to enter into the 2021 Agreement.  *Id.* ¶ 13.  Pivar does not deny the existence of the

2021 Agreement.  The Court finds that Philip has stated a prima facie case that his claim is not the

subject of a bona fide dispute.

Philip contends that, during the term of the 2019 Agreement, he performed his duties and

undertook "substantial efforts to sell objects in the collection."  Philip Certification  ¶¶ 7–8. He

---

[22]    The email is annexed as Exhibit A to the Philip Certification.

says that, during that period, Pivar failed to provide full payment under the 2019 Agreement and paid him only approximately $27,000.00 in "sporadic payments." *Id.* ¶ 9. He states that Pivar paid him a "commission bonus" of $40,000 for a sale of "personal materials from the estate of Willem de Kooning." *Id.* ¶ 10. He contends that he is owed approximately $183,000 on the 2019 Agreement, which he has not been paid to date. *Id.* ¶ 11. He makes the same allegations in support of the Complaint. *See* Complaint ¶¶ 12–17. Pivar denies them in his State Court Answer ¶¶ 12–17. Philip contends that he performed his duties as outlined under the 2021 Agreement, including, acting as curator of the Pivar Collection and attempting to sell pieces from the collection. Philip Certification ¶ 14. He asserts that during the term of the agreement, Pivar failed to pay him the agreed upon monthly stipend of $6,000.00 and failed to reimburse him for his short-term housing, which amounted to approximately $15,000.00. Philip Certification ¶¶ 15–16. He also complains that the Alleged Debtor impeded his ability to obtain commissions for the sale of major works, and failed to pay him commissions in excess of $20,000 on sales which he allegedly successfully brokered. *Id.* ¶¶ 17–18.

Pivar contends that Philip breached the 2019 and 2021 Agreements, and, in any event, that Philip overstates his claim under the agreements. Amended Answer ¶¶ 17–24; Objection at 3–4. In his pro se Amended Answer, Pivar challenges the quality of Philip's work in general. Amended Answer ¶¶ 21–23. Assisted by counsel in his Objection, he goes a step further and "disputes whether work was ever done" by Philip under the agreements. Objection at 3. As a particular example, Pivar asserts that Philip persuaded him to retain a particular authenticator, whom Philip described as a highly respected Rembrandt scholar, for $63,000, in order to authenticate a portrait of Rembrandt in the Pivar Collection as a genuine Rembrandt self-portrait. Amended Answer ¶ 21. The purpose of that report was to consummate a sale Philip had arranged for $65 million to

28

an institutional purchaser.  *Id.* ¶ 22.  Problematically, the painting Philip was trying to sell was not

a genuine Rembrandt—it was instead a 19th century copy of a well-known Rembrandt self-portrait

that is hanging in the National Gallery in London.  *Id.*  Pivar also complains that, in breach of the

agreement, Philip failed to document the sales of artwork.  Objection at 3–4.  Specifically, he

"denies the petitioner provided documentation for work claimed, and denies that petitioner

provided all documentation regarding the sale of artwork from the Pivar Collection."  *Id.* at 3.

Notably, Philip makes substantively the same allegations in support of the state-court Complaint,

*see* Complaint ¶¶ 18–25, and Pivar denies them in his State Court Answer ¶¶ 18–25.

Pivar also asserts that Philip mismanaged the records of sales made from the Pivar

Collection.  He states that, when Philip purchased works for the Pivar Collection, Philip collected

a commission from the seller, and Pivar then paid Philip an additional bonus.  Amended Answer

¶ 23.  Pivar specifies that the $40,000 payment for the de Kooning personal materials was not a

commission, but an added bonus on top of the seller's commission.  *Id.*  More to the point, Pivar

asserts that Philip did not disclose the "actual prices that Philip received when he made sales on

my behalf from my collection."  *Id.*  The 2019 Agreement contemplates only a $6,000 monthly

payment to Philip, plus commissions for sales Philip made during the one-year period.  It does not

contemplate bonuses for purchases made to the collection, such as the $40,000 payment from Pivar

to Philip as a reward for purchasing the de Kooning materials.  Philip includes this $40,000 figure

in his damage calculation.  Pivar challenges whether that figure would be covered under the

contract.

The Court finds that Pivar has raised material factual issues that demonstrate there is a bona

fide dispute as to Pivar's liability to Philip under the 2019 Agreement and 2021 Agreement.  *See,*

*e.g.*, *In re TPG Troy*, 793 F.3d at 234 (finding a bona fide dispute based on the existence of certain

potentially viable arguments by the debtor regarding liability); *In re Taub*, 439 B.R. at 274 (finding

a bona fide dispute where the putative debtor had "asserted colorable defenses"); *In re Mountain*

*Dairies, Inc.*, 372 B.R. at 634 (finding a bona fide dispute where "the circumstances surrounding

the parties' relationship are the subject of substantial dispute").

*The AMC Agreement*

Philip maintains that in or around November 2021, Pivar contacted him to discuss reviving

the American Microcar Company, Inc., which Philip believes had been defunct since 1980. Philip

Certification ¶ 22. He says that in December 2021, Pivar (i) offered him the job of Vice President

of AMC at an annual salary of $250,000, plus an ownership interest in AMC, and (ii) promised to

pay him an additional $50,000.00 to continue in his role as Keeper of the Pivar Collection (the

"AMC Agreement"). *Id.* ¶¶ 23–24. He says that over the next several months, he worked with

AMC's chief technical officer to locate and lease a workshop for the company in West Babylon,

New York, to hire staff, and to buy industrial equipment. *Id.* ¶ 25. Philip asserts that neither AMC

nor Pivar paid him the agreed-upon salary. *Id.* ¶ 26. In May 2022, Philip stopped working for

AMC, after not being paid for several months. *Id.* ¶ 28.

Philip makes the same allegations against Pivar and AMC in support of Count Four of the

Complaint. *See* Complaint ¶¶ 30–39. In Count Four, he asserts that "Pivar individually and on

behalf of [AMC] breached his obligations under the AMC Contract." *Id.* ¶ 74. He contends that

"[a]s a result of Defendant Pivar's actions, individually and on behalf of [AMC], [he] has sustained

injury in the approximate amount of $175,000.00, plus interest." *Id.* ¶ 75. Pivar denies Philip's

allegations. *See* State Court Answer ¶¶ 30–39, 74, 75.

Philip does not contend that he had a written employment agreement with Pivar for his

work at AMC. The only document that he points to in support of this claim against Pivar is an

email from Pivar to Michael in which Pivar describes Philip as "the most effective organizer that I have ever worked with over 50 years." Philip Certification, Ex. B. However, that does not mention AMC and does not support his claim that Pivar is liable to him for the work he did for AMC. Moreover at the Hearing, Philip's counsel acknowledged that Michael may have been employed by AMC, not Pivar. Philip has not made a clear showing that Pivar is liable to him for the work he did at AMC, let alone that Pivar is liable to him in a "particular amount."

Further, Philip submitted no documentation to support his claim that Pivar promised to pay him an additional $50,000.00 to continue in his role as Keeper of the Pivar Collection. Accordingly, he fails to make a prima facie case with respect to this component of his claim. *See In re Mountain Dairies, Inc.,* 372 B.R. at 631–33. Even if Philip could meet his initial burden on this component of his claim, Pivar's State Court Answer establishes that the claim is subject to a bona fide dispute as to liability. In the Complaint, Philip alleges that "Pivar also promised to pay Mr. Mezzatesta an additional $50,000 to continue in his role as Keeper of the Pivar Collection as inducement for Mr. Mezzatesta to accept the role of Vice President of AMC." Complaint ¶ 32. Pivar specifically denies this allegation. State Court Answer ¶ 32. Philip has failed to establish a prima facie case that no bona fide dispute exists as to these claims against Pivar. *See In re TPG Troy, LLC*, 793 F.3d at 234; *In re Euro-Am. Lodging Corp.*, 357 B.R. at 712 n.8; *In re Mountain Dairies, Inc.*, 372 B.R. at 631–33.

*The $50,000 Loan*

Philip asserts that the Alleged Debtor asked for a loan in the amount of $50,000.00 to purchase seven paintings attributed to various Impressionist and Modern masters (the "Seven Masters Paintings") and, in exchange for the loan, offered Philip interest on the loan plus a share of ownership in the paintings (the "$50,000 Loan"). Philip Certification ¶ 19. He says that he "purchased the Seven Masters Paintings in [his] own name with $50,000.00 of his personal funds,"

31

and that, therefore, the "Seven Masters Paintings are [his] property, not the Alleged Debtor's," and they "must be returned" to him. *Id.* ¶ 20. In his Certification, Philip purports to "advise the Court and any trustee appointed in this case that, although the subject Seven Masters Paintings are in the possession of the Alleged Debtor, they are Philip's property and must be returned to Philip." *Id.* He asserts that the Alleged Debtor did not repay him the $50,000 loan and has not returned the paintings to him. *Id.* ¶ 21.

Philip did not submit any written documentation memorializing the $50,000 Loan. Moreover, although Philip labels the transaction as a "loan" to Pivar, the facts he alleges do not describe a claim on account of an unpaid loan. Philip asserts that he owns the seven disputed paintings and asks for their turnover, arguing that he bought the paintings in his own name with his own money. Philip has not met his burden of demonstrating that his claim is not subject to a bona fide dispute.

The Court finds that each claim asserted by Philip against Pivar is subject to a bona fide dispute as to liability and amount. Accordingly, Philip is ineligible to serve as a petitioning creditor under section 303(b)(1).

Claims for Withheld Wages

The Petitioning Creditors also assert that they each had a relationship with the Alleged Debtor that was "akin to that of employer-employee." Reply at 10. They say that Pivar cannot create a dispute over a claim for wages from his dissatisfaction with an "employee's work product." *Id.* at 11. They specify that Pivar's "preference for a different report or appraisal is irrelevant to the question of whether he owes Petitioning Creditors the sums they worked for" because an employer "who is dissatisfied with his employee's work product must nonetheless pay his employee the wages they earned." *Id.* at 10–11. They assert that it is "undisputed that the

[Petitioning Creditors] were solicited and hired by Debtor to curate, appraise, manage, lend, and provide services." *Id.* at 11.

The Petitioning Creditors have not alleged facts demonstrating that they hold wage claims against Pivar. First, Anne does not contend that she was in an employee-employer relationship with Pivar. She has submitted an invoice for discrete services that she contracted to perform for Pivar. Michael is not asserting a claim for unpaid wages in this proceeding. He is asserting only a claim for $100,000 on account of the $88,000 Demand Note. *Id.* at 9. The Reply mentions that Michael believes he is "owed $1.5 million to establish, create, and run" a hypothetical museum, but he is not asserting that claim in support of the Involuntary Petition. *See* Involuntary Petition, Part 3, Item 13. Accordingly, Michael has not asserted a claim for unpaid wages.

Three of Philip's claims are based, respectively, on the 2019 Agreement, the 2021 Agreement, and the AMC Agreement. The agreements did not call for Pivar to employ Philip. In any event, as demonstrated, Pivar disputes liability under those agreements. The Court has determined that those claims are subject to bona fide disputes. Belatedly labeling the claims as "wage claims" does not alter that status. Philip's fourth claim is on account of the $50,000 Loan. That is plainly not a wage claim.

**Section 303(i)**

Pivar requests attorney's fees and costs under section 303(i) of the Bankruptcy Code. Response at 9–10. In support, he asserts that the Petition is meritless and was filed only to obtain a strategic advantage in the state-court action. *Id.* at 9. Moreover, it is "unconscionable" that "a family of wealthy art collectors from The Hamptons" should attempt "to force a 93-year-old man into bankruptcy." *Id.* at 9–10. Pivar also challenges the failure to disclose the promissory note

until "the eleventh hour," and he makes the point that "Mr. Pivar clearly did not sign" it. *Id.* at 9. Accordingly, Pivar asserts that he is entitled to fees and costs.

A separate hearing will be conducted to address Pivar's request for attorney's fees and costs under section 303(i)(1). *See In re Turner*, 80 B.R. 618 (Bankr. D. Mass. 1987) (deciding that the petitioning creditors did not file in bad faith and allowing the alleged debtor ten days to move for attorney's fees or costs under section 303(i)(1)); *In re TPG Troy, LLC*, 492 B.R. at 153 ("In addition, within twenty-one (21) days after the date of this Order, the [alleged debtors] may apply to the Court, upon a proper showing, to recover their costs, reasonable attorney's fees, and damages, as provided in section 303(i) of the Code."); *see also In re Navient Solutions, LLC*, 627 B.R. 581, 586 (Bankr. S.D.N.Y. 2021) (ruling on section 303(i) request after a separate fee hearing).

## Conclusion

Based on the foregoing, the Court finds that the Petitioning Creditors failed to carry their burden of proof under section 303(b) of the Bankruptcy Code, and that they are ineligible to act as petitioning creditors under section 303(b). The Court denies their request for relief under chapter 7. Because the Involuntary Petition is not supported by any eligible petitioning creditors, the Court dismisses the Involuntary Petition. Accordingly, the Court does not reach Pivar's request for dismissal under sections 305 and 707 of the Bankruptcy Code. Counsel for Pivar is instructed to

contact Chambers to establish procedures for resolution of his request for reasonable attorney's fees and costs under 11 U.S.C. § 303(i).  *See* 11 U.S.C. § 303(i)(1).

IT IS SO ORDERED.

Dated: New York, New York
       February 27, 2024

/s/ *James L. Garrity, Jr.*
Hon. James L. Garrity, Jr.
U.S. Bankruptcy Judge